Filed 5/27/21  Yu v. Squab Producers of Cal. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RIVER YU,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SQUAB PRODUCERS OF CALIFORNIA ,<br><br>Defendant and Respondent. | F077553<br><br>(Super. Ct. No. 2017501)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Law Offices of Michael L. Abbott and Michael L. Abbott, for Plaintiff and Appellant.

Law Offices of Tony J. Tanke and Tony J. Tanke, for Defendant and Respondent.

-ooOoo-

River Yu, the owner of a squab ranch, brought an action against Squab Producers of California (SPOC), an agricultural cooperative engaged in the purchasing, processing, and marketing of squabs for food. Squabs are young pigeons, about 30 days old, that are sold as a delicacy to restaurants and distributors. Yu was a member of SPOC, and like the approximately 60 other SPOC members, was bound by a produce sale agreement (PSA or the contract) to sell his squabs to SPOC for resale to distributors and restaurateurs. Yu filed the instant lawsuit alleging contract and fraud claims after SPOC terminated the PSA and Yu's membership in the cooperative. The trial court, after a bench trial, found that Yu had failed to prove his claims and entered a take-nothing judgment against him. Yu challenges the judgment on appeal. Yu's brief however raises only conclusory claims unsupported by adequate legal argument and requisite citations to the record. His claims therefore fail as improperly raised. Indeed, we conclude he has waived his claims on appeal. Accordingly, we affirm the judgment.

## PROCEDURAL HISTORY

Yu brought an action against SPOC in a complaint alleging six causes of action: (1) breach of contract; (2) breach of contract for failure to perform; (3) breach of implied covenant of good faith and fair dealing; (4) anticipatory repudiation; (5) fraud/misrepresentation; and (6) enjoin expulsion. The first four claims were contract claims, the fifth claim was a tort claim for fraud, and the sixth claim sought injunctive relief (reinstatement of Yu's membership in SPOC ). The contract claims were overlapping, and each sought identical compensatory damages of $102,329.14. The fraud claim sought compensatory damages of $102,329.14, plus punitive damages and equitable relief.

SPOC filed an answer to Yu's complaint. The answer asserted 28 affirmative defenses, including breach of contract excusing SPOC's performance, excuse and prevention of performance, failure of consideration, repudiation, frustration of purpose,

2.

failure of conditions, and Yu's own acts or omissions constituting the cause of his alleged damages. SPOC also filed a cross-complaint, which is not at issue in this appeal.

The matter was tried before the trial court in a five-day bench trial. Thereafter, the court issued an initial statement of decision and, following objections and proposed revisions filed by SPOC, an amended statement of decision. The court found in favor of SPOC as to all of Yu's causes of action.

A judgment after court trial was entered on March 27, 2018. Yu took nothing from SPOC; SPOC took nothing on its cross-complaint against Yu. Yu filed the instant appeal, which appears to challenge only the trial court's resolution of his "breach of contract claims."

## FACTS

SPOC is a non-profit agricultural cooperative marketing association that was created on May 5, 1943, pursuant to Chapter I of Division 20 of the California Food and Agriculture Code. SPOC processes and markets squabs raised by its member-producers. Yu, who owned a squab ranch, was one of SPOC's member-producers.

SPOC had enacted and restated articles of incorporation and bylaws governing its operations. The association is governed by five directors who are elected from the membership to serve on the board of directors. During the period relevant to this appeal, the board consisted of Chairman Tim Beck, Vice Chairman Dan Parker, Secretary Lloyd Wagner, and board members Dennis Sonke and David Flora. SPOC chief executive officer (CEO) Dalton Rasmussen and chief financial officer (CFO) Lyhne Cunningham were nonvoting board members.

Pursuant to the bylaws, SPOC's board was empowered to "require any member … to enter into any marketing … or other agreement with the Association that the Board may deem appropriate as a condition to membership in this Association." (Bylaws, Article VIII, § 1.) This includes making sale agreements for "[p]roducts produced by members," as well as "rules and regulations … deemed necessary for the government and

3.

guidance of … members of the Association [that are] not inconsistent with the laws of the State of California, the Articles of Incorporation, the Produce Sale Agreements and these Bylaws." (Bylaws, Article V, § 16 (b) & (k).)  The bylaws also included provisions governing the termination and expulsion of members.  (Bylaws, Article II, §§ 6, 7, 8.)

In 2014, when the events giving rise to the instant action occurred, SPOC had 60-62 members.  SPOC's board made final decisions on membership.  All members must sign SPOC contracts and program affidavits.  As a member, Yu was required to sign a produce sale agreement (PSA or the contract), affidavits for animal welfare and quality assurance, and a commitment to abide by SPOC's rules and regulations.

### *The Produce Sale Agreement*

As stated, SPOC's producer-members execute a PSA with SPOC under which the producer-members pledge to sell, and SPOC pledges to buy, their squabs.  (PSA, § 2.) Yu had signed and executed a PSA with SPOC.  Pursuant to the PSA, the producer "agrees to use its best efforts to breed, raise, feed, care for, and deliver Squabs of the highest quality obtainable, at the Producer's own expense, to the Association at its facility."  (PSA, § 3.)  Under the PSA, SPOC, in turn, "agrees to resell the Squabs delivered to it by [the] Producer on the terms and in the form determined in the sole discretion of the Association, and to pay to [the] Producer as the purchase price of the Squabs[,] the net resale proceeds" as described in the contract and in SPOC's bylaws. (PSA, § 5.)

SPOC was accorded broad rulemaking powers under the contract.  SPOC was authorized to "make rules and regulations regarding the breeding, raising, feeding, caring, and delivery of Squabs covered by [the PSA]."  (PSA, § 6.)  The producer was, in turn, obligated to "observe and to conform to [SPOC's] rules and regulations," and to "participate fully in programs adopted by the Association relating to the quality, safety and welfare" of the squabs.  (PSA, § 6.)  In addition, the producer was required to "provide to [the] Association within a reasonable time of Association's request, any

4.

documentation evidencing compliance with any applicable … rule, regulation, or standard of the Association." (PSA, § 6.) SPOC was authorized to "reject or refuse to accept delivery of any or all Squabs, which in its sole discretion do not conform to the standards established by it." (PSA, § 6.)

The PSA expressly incorporated into the contract SPOC's articles of incorporation and bylaws, as well as any amendments thereto, including the provisions of the bylaws addressing termination of membership and expulsion of members, respectively. (PSA, § 9.)

### SPOC's Animal Care and Welfare Program

Exercising its rulemaking powers under the contract, SPOC's board of directors adopted an animal care and welfare program (welfare program), effective January 2010, as part of SPOC's quality assurance program. All members were required to comply with the program. Yu was trained on the program on February 9, 2010, and signed a "farm compliance affidavit for Yu Squab Ranch indicating that he under[stood] the [welfare program] and [would] comply [with it]." The affidavit signed by Yu certified that Yu understood SPOC's "zero tolerance policy" for "any form of abuse to animals," that he had a " 'clear working knowledge' " of the welfare program, and that he would "comply fully" with the welfare program. Yu acknowledged that he was trained on the Welfare Program and understood SPOC had a zero-tolerance policy regarding any form of animal abuse on members' farms. SPOC's CEO testified: "The farmer-owner affidavit is good until canceled, because we wanted to have something on file at the plant that we could present to the USDA when they have their audits and to our customers."

The welfare program outlined basic requirements for bird health, safety, and wellbeing. The president of the California Poultry Federation testified that his organization assisted SPOC in developing the welfare program. He described the scope of the welfare program: "Basically it's a program to where every ranch has to have biosecurity in place, quality assurance in place, and be sure that the birds are taken care

of properly." He testified that SPOC was required to have the welfare program in place in order to be certified by the California Poultry Federation. He testified he had addressed SPOC's producers "about how important it was to follow animal welfare guidelines to keep their industry and their own farm out of problems." Finally, he testified that any reports of lack of compliance at a member farm are investigated by means of a site visit to ensure compliance.

SPOC's CEO testified that SPOC's welfare program was comprehensive, in that it covered feeding, nutrition, space requirements, ventilation, protection from the elements, health care, proper handling, proper transportation, and good commercial practices. The welfare program specifically provides: "Full access to feed should be available to all birds in a given loft or pen at all times." (Welfare Program, § III (1).) SPOC's CEO also testified: "Well, the animal welfare program states pretty clearly that food and water must be available at all times." He explained the feed required for the birds: "Primarily they eat a diet of two-thirds whole corn. You can feed other grains, but corn is typically the main grain they eat. And then one-third of their diet is based off a pellet that has various – we have our own recipe that we approve for the pellet, which is still a corn-based pellet." SPOC's CEO testified that deviation from proper animal care and welfare practices would be devastating to the squab industry.

The welfare program provided it would be enforced through monitoring of producer-member farms pursuant to Section IX of the Welfare Program. The purpose of such monitoring was to "provide for rapid recommendation and implementation of corrective actions as needed." (Welfare Program, § IX (3).) The welfare program provided that SPOC, in cooperation with government and industry groups, would "random monitor" producers for compliance. (Welfare Program, § IX (1).) The welfare program further provided for additional monitoring by the "consulting veterinarian" during "regular visits" regarding the producers' "adherence to the guidelines." (Welfare Program, § IX (1).)

SPOC's CEO testified that, during the time period relevant to this matter, producer-members were required to submit to random inspections of their farms on demand by SPOC and SPOC in fact undertook such random inspections to ensure compliance with its rules and regulations. SPOC's CEO further testified that SPOC was not required to provide the producer with any reason for performing inspections; nor was SPOC required, in the event it received a report of any producer's noncompliance with SPOC rules, to divulge the name of the reporting party to the producer. The chairman of SPOC's board also confirmed that SPOC conducted both noticed visits and "surprise visits" in order to inspect member farms. SPOC's consulting veterinarian, Dr. Mark Bland, often conducted the inspections.

### *Termination of Yu's PSA and Membership in SPOC, Pursuant to Section 6, Subpart (d) of Article II of SPOC's Bylaws, on Account of Yu's Breach of PSA*

Dalton Rasmussen, SPOC's CEO, testified that, on October 31, 2014, Yu's membership in SPOC was terminated by the board of directors for failure to allow SPOC to conduct "a welfare check of his birds" in order to confirm "compl[iance] with the animal welfare program." Rasmussen testified: "We were afraid that Mr. Yu was not going to follow the animal welfare program, and we wanted to get him to comply." When Yu refused to allow SPOC to conduct a welfare check of the conditions of the birds on his farm, SPOC's board convened an emergency meeting at which Yu's contract and membership were terminated. The events underlying the termination were set in motion on Friday, October 24, 2014, when SPOC's longtime production supervisor, Refugio Salgado, received a phone call from Yu's employee Manuel[1] (Garcia had previously worked for SPOC for approximately seven years, under Salgado's supervision). Salgado testified that Garcia reported to him that Yu's farm was out of feed for his squabs; Garcia asked Salgado what to do. Salgado told Garcia to call Garcia's

---

[1] Manuel's full name was Manuel Garcia Lopez but during the trial he was referred to as Manuel Garcia.

7.

boss, River Yu.  The following Monday, October 27, 2014, Salgado informed SPOC's management about the information relayed by Garcia, and SPOC's CEO, Dalton Rasmussen, in turn, informed the board.  Rasmussen testified he and the board members were concerned that "an animal welfare issue at one of [SPOC's] members' farms would not only damage [SPOC's] reputation with [its] customers and the public, but could cause serious financial damage to the cooperative itself."

The next day, Tuesday, October 28, 2014, Rasmussen, in an effort to obtain further information and to ascertain whether there genuinely was a problem at Yu's farm, asked Salgado to call Garcia to determine the status of feed availability at Yu's farm at that point.  Salgado phoned Garcia, who again reported that there was no feed to provide to the birds at Yu's farm.[2]  Garcia confirmed that he had advised Yu of the situation.  A few days later, after SPOC had contacted Yu regarding the problem, Garcia called Salgado.  Garcia was upset that Salgado had reported the matter to SPOC's management and the issue had been brought to Yu's attention.  Salgado testified that he told Garcia, " 'Hey, I doing [sic] what I had to do.' "  Garcia also testified at trial; he denied ever having called Salgado in connection with conditions at Yu's farm or reporting a lack of feed at Yu's farm.

On Tuesday, October 28, 2014, at 9:51 a.m., CEO Rasmussen emailed Yu to inform him of SPOC's concerns about a lack of feed at Yu's farm and the necessity of conducting a welfare check to assess the situation.  Specifically, Rasmussen's email stated: "I have received some disturbing reports that your birds have been without feed for several days since Friday.  I also understand that they have not been fed at this moment.  The animal welfare affidavit we have on file clearly states that all birds must have full access to feed and water at all times.  I need to know if these reports are true.  If

---

[2]     Salgado was in SPOC's facility when he called Garcia; Rasmussen was present; Salgado and Garcia conversed in Spanish.

true, then I need to know your immediate corrective action plan to remedy. I have also contacted Dr. Bland [SPOC's consulting veterinarian] and we will be at your farm on Friday 10/31/14 to conduct a welfare check of your birds. Please have your quality assurance documents ready as we will also be assessing them to determine your compliance with the program. Refusal to grant entry to your premises for the welfare check will constitute a violation of the produce sale agreement which may be terminated. Please reply." Rasmussen and Yu exchanged approximately 10 emails that day regarding the situation. However, Yu never told Rasmussen that Yu's birds were properly fed at the time or denied the veracity of the reports brought to his attention by Rasmussen.

Yu responded to Rasmussen's initial email as follows: "Please, disclose the source of your report. I do not allow witch hunting." Rasmussen followed up: "I am sorry but the source of the report is confidential. What is important is I am required to investigate any animal welfare issues brought to my attention for your benefit as well as the membership. Are you refusing to let us perform a welfare check? Please let us know." Yu countered, "[I]f you do not have the source and any detailed information, then you have no direct knowledge about … my feed status." When Rasmussen asked for clarification as to whether SPOC had permission to enter Yu's farm for the welfare check on either the coming Friday or Saturday, Yu responded: "[Y]ou take it as that, like your informant's info." Yu followed up with another message: "[I]f you were worry about my birds welfare, then you will be able to tell me where I need to add feed in my farm so all my birds will have access to it. [I]f you can not, you are full of **it. [L]ike my feeders." Rasmussen informed Yu that the welfare check would be conducted on Saturday morning, eliciting the following response from Yu: "Without anymore info, then the doc [i.e., SPOC's veterinarian] can wait all day by the side of the road."

Rasmussen kept SPOC's board apprised of the email communications with Yu. Tim Beck, the chairman of SPOC's board, testified that he was privy to all the emails between Rasmussen and Yu and was in "daily" communication with Rasmussen over the

9.

issue. Beck sent an email to Rasmussen, copied to the rest of the board, on Wednesday, October 29, 2014, at 8:12 a.m., as follows: "[Yu] hasn't answered your question about if the birds had feed or not. We must assume that they do not. If he is not meeting our animal care and welfare policy then we cannot receive his birds. He has put himself in this position by his actions. Again, he has shown his contempt for the management, board and the cooperative." Yu, for his part, sent multiple emails to Beck and the rest of the SPOC board.

Beck interceded with Yu on October 30, 2014, sending him in an email stating: "River, [¶] Dalton [Rasmussen] has followed a longstanding policy that is part of our animal care and welfare program. Having Dr. Bland [the consulting veterinarian] visit your farm protects you and the cooperative from any reports of misconduct. This is a free service to you, covered by the cooperative. Dr. Bland makes many visits a year. He has actually checked my farm, a couple years ago, due to a [neighbor] making a false complaint. I believe Bob [Shipley, the former CEO of SPOC,] has made surprise visits in the past." Yu responded by email: "[C]an you verify that there are credible reports of abuse, and that it is from first hand witness/es. I can not take this false accusations from the president without any eviden[ce]. I will delivery my birds [to SPOC] as scheduled." Beck also talked to Yu by phone that afternoon. Beck testified: "I tried to explain to him that all he needed to do was … comply with the animal care requirements [¶] …[¶] [w]hich is to allow access and to check his birds, and that it was for his benefit, just like I had written to him before."

After consulting with the board, Rasmussen sent an email to Yu at 9:09 a.m. on October 30, 2014, again informing Yu that Rasmussen and Dr. Bland would conduct a welfare check of Yu's farm on Saturday morning and requesting that Yu or his representative be available to allow the inspection. More specifically, Rasmussen's email stated:

10.

"River,

Your refusal to abide by our Animal Welfare Program and [to] agree to a welfare check puts the Board, management, and the rest of the membership in a difficult position. I have tried to set up a welfare check to assess whether the reports from your farm are true. I have asked you directly whether these are true and you have evaded that question as well. Squab Producers of California is committed to our Quality Assurance and Animal Welfare programs having each member agree to comply with the program as a condition of membership. We also have your affidavit [in] which you declared that you understand and have a clear working knowledge of the plan. This includes [your] acknowledgement that Squab Producers of CA has a zero tolerance policy against any form of animal abuse. In cases where management receive credible reports of abuse, it is our obligation to investigate. Dr. Bland and I will be at your farm Saturday morning to assess the conditions of your birds. Please have yourself or your representative available to conduct [the] audit, we will not enter your premises without someone available. [¶] Squab Producers of California cannot accept birds from your farm until this is resolved. Do not ship birds to the plant as they will not be accepted. You have been taken off the schedule for this week and until compliance is reached. If you do not comply with the program your membership will be terminated."

Yu responded to Rasmussen's email, minutes later, as follows: "Show me credible report and I will show you the door. If not you can wait outside."

Later that day, at around 2:00 p.m. on October 30, 2014, Yu personally appeared at SPOC's processing plant to pick up his bird crates from the previous delivery so he could deliver new birds later in the day. Yu discovered that Rasmussen had changed the gate locks to the night-receiving area in order to prevent Yu from dropping off his birds. Yu went to the office to try to obtain the new keys. Rasmussen testified that he was notified by the plant manager that Yu "was pounding on the front door" of the office. A few staff members were present in the office. Rasmussen went to open the front door. Rasmussen testified: "Well, [Yu] started by saying that he needed the keys to the gates because he [wanted to drop off his birds after hours]. And I told him that his birds were not going to be accepted, and that was communicated to him several times that day. And he said that he wasn't leaving until he got the keys." Rasmussen continued: "I mostly

11.

kept repeating that [Yu] needed to leave. He had placed his body inside the door to where I could not shut the door, and he tried to push past me." Rasmussen added that Yu "stayed in the door [for] about 20 minutes" and shoved Rasmussen a couple of times. The Modesto Police were called and arrived shortly thereafter; the responding officer advised Rasmussen that SPOC should seek a restraining order to prevent Yu from returning to the premises. Rasmussen wrote an email to the board at 3:19 p.m. to advise it of the incident.[3] Yu also emailed the board to complain that Rasmussen had acted improperly in changing the locks to prevent Yu from dropping off his birds later that day. Subsequently, after hours, Yu left a crate of 31 birds on the front porch of SPOC's facility, in an unprotected area.[4] SPOC eventually obtained a temporary restraining order against Yu on November 4, 2014, and a final two-year restraining order on December 2, 2014.

The incident between Yu and Rasmussen at the front door of SPOC's facility occurred on October 30, 2014. The next morning, at 5:30 a.m., SPOC's board convened an emergency special session; all the voting board members were present. The board voted unanimously to terminate Yu's produce sale agreement. Rasmussen testified: "[Yu's] produce sale agreement was terminated, which automatically terminate[d] his membership." Rasmussen testified the primary reason Yu's produce sale agreement was terminated was on account of Yu's breach of it "in not abiding by the animal welfare program." Rasmussen further explained that under section 6, part (d) of article II of SPOC's bylaws, termination of the produce sale agreement automatically terminated the

---

[3]    Rasmussen went to see Tim Beck, the chairman of SPOC's board, afterwards. Beck testified that Rasmussen was "obviously upset."

[4]    Yu sent an email informing SPOC he had left the birds. Rasmussen testified that the birds had to be euthanized because Yu "broke the chain of custody for the birds [by leaving] them on the front porch in an unsecured area" and because SPOC could not be "sure if those birds were even healthy" before a welfare check of Yu's farm was conducted.

producer's membership. Specifically, Rasmussen testified: "I just want to point out that we noted this in the board [meeting minutes] that [the membership termination] was under section six, part (d) [of article II of the bylaws], [upon] termination of the produce sale agreement, which [Yu] violated by not conforming to the animal welfare program." He added that the board terminated the produce sale agreement because SPOC could not "get [Yu] to comply" with the welfare program.

Section 6 of article II of SPOC's bylaws provides:

"Section 6. TERMINATION OF MEMBERSHIP. A membership and all membership rights shall automatically terminate upon any of the following events:

(a)     The loss of qualifications necessary for admission to membership;

(b)     The death of a member; provided, however, that within six months of the death of a member the personal representative or successors of such member may, if otherwise qualified to become a member, apply for a transfer of the deceased member's membership; thereafter, upon approval by the Board, the membership may be transferred to such person(s);

(c)     The dissolution of a corporate member;

(d)     **The termination of the Produce Sale Agreement to which the member is a party**;

(e)     The expulsion of a member pursuant to Section 7 of this ARTICLE." (Bold added.)

The minutes of the October 31, 2014 board special session state: "Motion Lloyd Wagner, second David Flora, passed unanimous to cancel Produce Sale Agreement of River Yu, effective immediately, based on his refusal to allow Dr. Bland on his property to conduct a welfare check of his birds. [¶] Motion Dan Parker, second Dennis Sonke, passed unanimous; to terminate the membership of River Yu, reference SPOC Bylaws, *Section 6*, 'Termination of Membership. A membership and all membership rights shall automatically terminate upon any of the following events,' *subpart (d)*[,] 'Termination of the Produce Sale Agreement to which the member is a party.' "

13.

On November 3, 2014, Rasmussen notified Yu, by letters sent by U.S. mail and certified mail, and by email, that Yu's membership in SPOC had been terminated by the board upon Yu's breach of the produce sale agreement. Yu testified that he received the notices. The November 3, 2014 email sets forth the chronology of events that led to the termination of Yu's contract.[5] At Yu's request, Rasmussen also confirmed that Yu was free to sell his birds outside of SPOC. To assist Yu, Rasmussen provided him with names of several other processor-purchasers to whom Yu could sell his birds.

### *Expulsion of Yu, in the Alternative, Under Section 7 of Article II of the Bylaws*

Rasmussen testified that although Yu's membership was properly terminated pursuant to Section 6(d) of article II of the bylaws, the board went further and expelled Yu from SPOC pursuant to sections 6(e) and 7 of article II of the bylaws, an alternative process for terminating a producer's membership in SPOC. Section 6(e) of article II of the bylaws provides that a member's "membership and all membership rights shall

---

[5] Rasmussen's email of November 3, 2014, stated in part:

"Mr. Yu,

On Friday 10/24/14, the plant received a report that your birds were out of feed. On Tuesday 10/28/14, I received a report that your birds were still out of feed. I received instruction from the Board to conduct an animal welfare check on your farm to assess the condition of your birds with our Association Veterinarian Dr. Bland. The Produce Sale Agreement clearly states under item 6, 'Producer participates fully in programs adopted by the Association relating to quality, safety and welfare of the pigeons and other members of the Association,' (See Exhibit A.) The Farm Compliance Affidavit you signed also states clearly that you understand and will comply fully with the Squab Producers of California Animal Care and Welfare Program. (See Exhibits B and C.) After *many* attempts to set up a visit with our Veterinarian you flatly refused. The Board made the decision to not accept birds from you until compliance was reached which was communicated to you on 10/30/14. You continued to refuse compliance with the program. On 10/30/14, after being told that your birds could not be accepted, you attempted to force your way into the plant to take keys and documents under the false belief you own part of the plant."

14.

automatically terminate upon" the "expulsion of a member pursuant to Section 7 of [article II]" of the bylaws. Section 7 of article II of the bylaws provides:

> "Section 7. EXPULSION. A member i) who fails to comply with the Bylaws, rules or regulations of the Association, or ii) whose Products are not of a quality or nature up to the standards of the Association, or iii) who violates the terms of any contract with the Association, or iv) whose actions are deemed by the Board to be detrimental to the Association shall be expelled from membership in the Association by resolution adopted by a majority of the Board. After adoption of such a resolution to expel a member, the member shall have an opportunity to be heard, after reasonable notice is given pursuant to this Section. The Association must provide written notice of the adoption of the expulsion resolution and provide to the expelled member at least fifteen (15) days notice prior to the date of the expulsion hearing. The notice must be given personally or sent by first-class or registered mail to the last address of the member shown on the records of the Association.

> "An expulsion shall be effective immediately upon adoption of the expulsion resolution if the expelled member does not attend the expulsion hearing and shall become effective immediately upon the decision of the Board to uphold the expulsion resolution after the expulsion hearing. Upon an expulsion becoming permanent, the name of the expelled member shall be stricken from the membership rolls of the Association and all rights of the expelled member shall cease."

James Mayol, a corporate attorney for SPOC, testified regarding the purpose of the expulsion procedure: "Essentially Mr. Yu had been given notice of termination of his membership in the co-op, and the bylaws and other related agreements provide for an expulsion hearing, which is to give the member an opportunity to explain why he or she should not be expelled from membership." Rasmussen also testified regarding the additional expulsion process: "We were trying to follow the bylaws as closely as we could, but there's some conflicting articles in there, and one of them is that the produce sale agreement is terminated, then your membership is terminated. But then there's also the expulsion section that provides for a hearing. [¶] … We thought it was best that

[Yu] be given the opportunity to be heard, and so we did try to follow all the items in section seven [as well]."

The record shows that SPOC's board adopted an expulsion resolution pursuant to section 7 of article II of the bylaws, gave notice thereof to Yu on November 6, 2014, by email and by letter sent by both U.S. Mail and registered U.S. Mail, and set a hearing 18 days later at 10 a.m. on November 24, 2014. Yu was invited to attend the hearing by telephone in light of the fact that a temporary restraining order was in effect directing Yu to stay at least 100 yards away from SPOC's CEO and other employees. Yu appeared by phone at the appointed time for the hearing with SPOC's board; the duration of the proceeding was about 30 minutes. Yu did not say anything in his defense and the board did not ask any questions during the hearing. Yu hung up before the proceeding was adjourned. The board convened again the next day, November 25, 2014, at a regularly scheduled board meeting, and, in executive session, unanimously upheld Yu's expulsion as a member of SPOC. Board chairman, Tim Beck, sent a letter to Yu notifying him of his expulsion from SPOC; Yu testified that he received the letter.

### Termination of Yu's Contract Without Cause, Effective June 30, 2016

Section 17 of the Produce Sale Agreement between Yu and SPOC gave either party the opportunity to terminate the contract by giving written notice, between July 1 and August 1 of any year, of an intent to do so, with the termination taking effect "as of June 30 of the following year." (PSA, § 17.) SPOC gave notice to Yu on July 27, 2015, of its decision to terminate the PSA pursuant to section 17 of that contract. Yu testified that he received the notice from SPOC. Accordingly, the PSA was terminated effective June 30, 2016, and termination of the contract resulted in termination of Yu's membership in SPOC under section 6(d) of article II of SPOC's bylaws. This termination procedure was utilized in addition to the other termination processes described above.

16.

James Mayol, corporate counsel for SPOC, explained SPOC's decision to utilize section 17 of the PSA in addition other termination procedures: "Mr. Yu had – throughout this process had made essentially himself known that he didn't agree with the termination process. And in order to be basically belt-and-suspenders certain, there was a provision in the produce sale agreement that if you didn't otherwise have a cause, you could terminate the produce sales agreement basically on a time notice. [¶] So in addition to terminating him for the cause relative to the bird issue, we provided him [a] termination [notice], and it says, it speaks for itself, if that earlier termination was somehow ruled invalid, we were still terminating his produce sale agreement regardless."

### *Preexisting Disputes Between SPOC and Yu*

The record reflects that Yu had a preexisting dispute with SPOC over SPOC's proposed plan to start a breeder farm. Rasmussen testified that SPOC had to turn away 30 percent of its prospective business because of a shortage of marketable squabs. In light of the shortage, SPOC planned to start a cooperative breeder farm that would serve as a relatively low-cost source of breeder birds to SPOC members. SPOC took a straw poll of the membership to gauge interest in the project; all members voted in favor of the proposed breeder farm except for Yu. Yu mounted a campaign against the proposed farm, arguing that SPOC actually wanted to produce squabs, not breeder birds, in a bid to compete with its own membership. Eventually, SPOC sent Yu a letter authored by its counsel, James Mayol, on July 9, 2014, warning Yu that he was engaging in activities that potentially could be construed as detrimental to SPOC and could result in his expulsion.

### *The Parties' Theories and The Trial Court's Findings and Decision*

After both parties presented evidence at trial, they submitted trial briefs setting forth their arguments to the court. Yu noted in his trial brief that he sought "compensatory damages, reasonable attorney's fees and costs, appropriate [e]quitable

17.

relief, exemplary/punitive damages and reinstatement of his membership." Yu summarized his theory of the case in his trial brief as follows:

> "[T]his case involves a retaliation by Defendant against Plaintiff for questioning the business practices of Defendant. Thereafter[,] Defendant intentionally took direct action to terminate Plaintiff's membership in Defendant's organization. Specifically, Defendant made false accusations against Plaintiff, refused to accept and/or purchase Plaintiff's squabs under the existing contract, and terminated the Agreement with Plaintiff without justification. Defendant's termination of said Agreement, in effect, terminated Plaintiff's membership from the organization. Such acts by Defendant were in direct violation of the Agreement, direct violation of the Restated Articles of Incorporation of Defendant and direct violation of the Restated Bylaws of Defendant, all of which were incorporated into the Agreement. The foregoing acts by Defendant were performed in bad faith and resulted in a direct breach of the contractual agreement between Plaintiff and Defendant."

SPOC argued in its reply trial brief that it was compelled to terminate Yu's contract because of Yu's own behavior in refusing to allow a welfare check of his birds, in violation of his contractual obligations. SPOC contended: "Yu characterizes SPOC's termination of the Agreement as an unjustified breach of contract in retaliation for Yu's prior conduct toward SPOC. He bases his theories of liability on the accusation that SPOC terminated the Agreement 'without justification.' … He conveniently ignores the fact that SPOC's refusal of his birds and termination of the Agreement was warranted, if not compelled, by Yu's own behavior." SPOC argued that "Yu's performance was not completed or excused, and his failure to allow a welfare check was unjustified." (Unnecessary capitalization omitted.) SPOC contended:

> "SPOC was obliged to investigate the allegations regarding Yu's birds. [Manuel] Garcia, Yu's employee, had everything to lose by making the report of the lack of feed to Refugio Salgado, but made the report as he was required to do pursuant to the provisions of the Animal Welfare Program. Mr. Salgado had nothing to gain by reporting the issue to Mr. Rasmussen. Any reports of animal abuse, such as lack of feed, must be promptly investigated and addressed for the sake of the member, the co-op, the squab industry, and the consumer. Consumers expect and request proof

of animal welfare inspections.  [Record citation.]  One of the purposes of the inspection was for Yu's protection against reports of misconduct.  [Record citation.]  Yu's refusal was not justified in light of his contractual obligations and the potential consequences to Yu and SPOC.  [¶]  Because Yu's performance was not excused, his failure to comply with his contractual duties constitutes an unjustified material breach of the Agreement."  (Unnecessary capitalization omitted.)

SPOC argued:  "Conversely, while Yu had no justification to refuse the welfare check, his own conduct excused SPOC's performance per the terms of the Agreement."  In short, "SPOC's refusal to accept Yu's birds and termination of the contract was warranted and its performance excused."  (Unnecessary capitalization omitted.)

SPOC further argued that Yu was, in addition, properly expelled pursuant to article II, section 7, of the bylaws; "[Yu] was given notice and opportunity to speak at the November 24, 2014 Expulsion Hearing" and "[t]he fact that [he] appeared by telephone to defend himself is proof of SPOC's substantial compliance with the notice required by [the] Bylaws."  Finally, SPOC contended that "SPOC sent an alternative notice of termination to Yu on July 27, 2015," which had "the effect of terminating the Agreement on June 30, 2016."  (Unnecessary capitalization omitted.)  SPOC argued Yu could not be reinstated as a member because his membership was properly terminated.

The trial court's amended statement of decision was entered on February 21, 2018.  The court noted "the Agreement between the parties specifically permitted welfare checks, and Plaintiff was required to allow the check" at SPOC's request.  The court found that "animal welfare was one of the paramount considerations for producer membership in [SPOC's] cooperative," and that "[Yu] declined to allow a welfare check after [SPOC] received notice of alleged failure to feed the birds."  The central finding in the statement of decision was that Yu committed a material breach of the contract or produce sale agreement by failing to permit a welfare check of his birds.  As a result of that breach, both the contract and Yu's membership were terminated by SPOC's board of

19.

directors on October 31, 2014. The court found Yu's failure to permit a welfare check of his animals to be fatal to all four of Yu's claims for contract damages.

As to the first cause of action, breach of contract, the court found in favor of SPOC, concluding: "[T]he Agreement is clear that a welfare check was required, and [Yu] failed to permit it." With regard to the second cause of action, the court observed: "As to [Yu's] second cause of action for Breach of Contract for Failure to Perform it is part and parcel the same as the first cause of action and the Court deems this cause of action as merged into the first cause of action. For that reason, the Court finds in favor of [SPOC] on this second cause of action." With regard to the third cause of action, breach of implied covenant of good faith and fair dealing, the court noted this claim requires a showing that the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract. The court held that this factor alone supported a finding in favor of SPOC because Yu had "declined to allow a welfare check of his squabs." As for the fourth cause of action, anticipatory repudiation, the court noted that this claim was " 'nothing more than a breach of contract claim than can be pursued before actual breach has occurred.' " The court again found that SPOC had the right to inspect Yu's flock, but Yu would not allow the inspection; had Yu allowed the inspection, the veterinarian "would have determined the status of the birds." The court concluded: "There was no evidence of anticipatory repudiation and therefore, the Court finds in favor of [SPOC] on this cause of action."

Yu's fifth and sixth causes of action, which are not at issue in this appeal, also failed. As to the fifth cause of action for fraud, it failed because the court found no fraud or misrepresentation in any of SPOC's alleged representations. The court found the sixth and final cause of action, enjoin expulsion from membership (that sought injunctive relief in the form or reinstatement of Yu's membership), failed because it merely stated a remedy unsupported by a viable cause of action, and, alternatively, because SPOC had

given an indisputably sufficient notice of termination of the contract on July 27, 2015.[6] The court stated: "[SPOC] was entitled to terminate [Yu's] membership both or separately for cause and/or without cause."

## DISCUSSION

I. **Sufficiency of the Evidence Supporting the Trial Court's Rulings on Yu's Contract Claims**

Yu's argument on appeal, while extremely brief, is largely impossible to decipher. Yu initially argues: "The record in this matter establishes that, given the evidence at trial and in the record, there was not only insufficient evidence to support the judgment of the Superior Court, but in NO such evidence [sic], and, as a consequence, the judgment of the Superior Court cannot be sustained on appeal. In fact, the judgment of the Court cannot be sustained on any grounds and cannot stand. The 'substantial evidence' standard is therefore applicable in determining the efficacy of the stated judgment of the Superior Court and whether it may withstand appellate scrutiny."

Yu then sets forth a series of sweeping factual statements with no citation to the record. For example, Yu states: "Spoc did not care for Yu and wanted him to go away." In addition, Yu states: "Spoc created from thin air such 'disturbing reports' of animal neglect as it need to prevaricate a charge against Yu. Garcia did not say what Spoc claims he said." Yu further states: "Admitting that the pretense of animal welfare was merely a ruse to get rid of Yu, Spoc also admitted it had violated the terms of its by-laws and held several more meetings but did nothing further to comply with the notice requirements." No citations to the record are provided for these and similar statements.

---

[6] The court indicated, without explanation, that it had concerns about some aspects of the notice and procedures utilized by SPOC to terminate Yu's membership. For example, the court noted: "In fact, the multiplicity of termination efforts were not models of proper and effective procedure." The court concluded: "Nevertheless, the Court finds in favor of [SPOC] as to this cause of action (remedy)."

21.

Yu then argues: "This disregard of the written rules, by-laws, testimony and customs of Spoc in first demanding, without authority or written notice, second rejecting the squabs delivered by Appellant, then terminating Appellant's membership under false pretenses, because they simply did not care for Appellant, constituted a breach of the contract between Appellant and Respondent, as established by the evidence introduced at trial." Yu further contends: "In this matter, the plain, b[l]ack and white language of the Agreement between Appellant and Respondent, as well as Respondent's damning reasons for creation of pretexts for the termination of the Agreement are the standard by which this Court should view the pretenses for breaching the Agreement with Appellant." Yu adds: "The pretenses employed by Respondent and adopted by the Superior Court not only impose duties on Appellant not listed in the Agreement but also absolve Respondent from its plain, written, contractual duties under the Agreement to provide written notice of any breach and an opportunity to cure any such breach." Yu continues: "In this case, Respondent simply cast aside the due process requirements of the Agreement and duty to state in writing any breach of the Agreement. The Superior Court in fact cited to a breach not in writing and took at face value alleged behavior by Appellant, which would have been justified under the circumstances of this case. [¶] In so doing, the Superior Court committed reversible error and ruled in favor of Respondents in contravention of the substantial evidence introduced at trial."

The text set forth in the above paragraph represents virtually the totality of Yu's argument on appeal. The "Argument" section of the opening brief does not contain any citations to the record. The "Argument" section does not reference, let alone discuss, any provision or provisions of the Produce Sale Agreement between Yu and SPOC or any provision or provisions of SPOC's bylaws, relevant to the trial court's resolution of Yu's claims and/or to Yu's claims on appeal. In addition, Yu does not identify the elements of the causes of action at issue or summarize the evidence adduced at trial in relation to the relevant causes of action. Similarly, Yu does not cite or address any specific findings or

conclusions reached by the trial court regarding the relevant causes of action, as set forth in the statement of decision. Nor does the "Argument" section contain citations to legal authorities relevant to any contract claim or defense at issue or address how the sweeping factual assertions referred to above relate to such claims or defenses under applicable legal standards and authorities.[7]

Our Supreme Court has made clear: "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.] 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) It follows that, "conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Yu has failed to show, with appropriate citations to the record and discussion of applicable legal principles and authorities, that the trial court prejudicially erred or that the trial court's findings are unsupported by substantial evidence, such that reversal of the judgment is required. Yu's conclusory claims of error necessarily fail. (*In re S.C.*, *supra*, at p. 408 ["[I]t is appellant's burden to affirmatively show error. [Citation.] To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."]; *Landa v. Steinberg* (1932) 126 Cal.App. 326, 325 [litigants are required to "present their cause systematically and so arranged that those upon whom the duty devolves of

---

**7**    The only case cited in the "Argument" section of the opening brief is *Masonite Corp. v. Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 10, which is cited for the proposition that "[t]he Court must avoid an interpretation that would result in a forfeiture."

ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass"].)

We note that this court had sua sponte stricken, on May 13, 2019, Yu's initial opening brief pursuant to rule 8.204 of the California Rules of Court, because that brief did not contain any argument, just a conclusory request for reversal of the judgment. Our order at the time, which gave Yu leave to file an amended brief, specified that "appellant has the duty to present his case systematically and arranged in a manner so this court can ascertain the facts and the rule of law [applicable] to each … issue." (See *Opdyk v. California Horse Racing Bd*. (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.) We also warned Yu that failure to submit an adequate brief would result in waiver of his claims on appeal.

Yu's instant brief merely recites conclusory claims, without appropriate citations to the record and to relevant legal authorities; this brief is therefore improper as well. Indeed, to the extent Yu attempts to argue that the trial court's determinations are not supported by substantial evidence, the claim is waived.[8] (*Department of Alcoholic*

---

[8]     SPOC extensively argues that Yu's brief does not contain cognizable legal argument or proper citation to authority. For example, SPOC contends: "Yu's brief appears to assume that he performed his contract with SPOC and that SPOC breached that contract by refusing to accept his squabs and terminating the contract and Yu's membership. But Yu offers neither a coherent argument nor any analysis of pertinent contractual provisions nor any statutory or case law supporting his assumptions. The same is true of other points he attempts to make. The brief is no more than a 'rambling and disjointed series of accusations' unsupported by any factual or legal analysis or authority." SPOC also argues: "The trial court expressly and repeatedly found that the contract between the parties '[was] clear that a welfare check was required, and [that] [Yu] failed to permit [such an inspection],' ruling that nearly all of Yu's claims faltered on his inability to prove compliance with the contract in this critical respect … Knowing full well that the statement just cited was *the* central factual finding he would have to address on appeal, Yu says *nothing* in his brief about the *testimony or contractual provisions* addressing the contract's welfare check requirement. Nor does Yu manage to articulate any appellate argument that SPOC could even hope to comprehend or attempt to answer. This is fatal to Yu's appeal."

24.

*Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078 ["Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review. The court is not required to make an independent, unassisted study of the record in search of error.  The point is treated as waived and we pass it without further consideration."]; *Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817 ["We consider all points asserted in this appeal to be forfeited as unsupported by 'adequate factual or legal analysis.' "]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'Appellate briefs must provide argument and legal authority for the positions taken.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 ["*any* reference [to a matter in the record] in [a litigant's] brief must be supported by a citation]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 ["[if litigants] contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*,' and[] 'unless this is done the error [assigned] is deemed to be waived' "].)

Given the deficiencies in Yu's brief, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.  Each side to bear its own costs.

SMITH, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.

25.